UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. _____

| | | |
|---|---|---|
| GENEVA BLANCHARD and TIFFANY MILLER, On Behalf of Themselves and All Others Similarly Situated, | ) ) ) ) | <u>CLASS ACTION</u> |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| BURGER KING CORPORATION, a Florida corporation, and BURGER KING WORLDWIDE, INC., a Delaware corporation, | ) ) ) ) ) | |
| Defendants. | ) ) | <u>DEMAND FOR JURY TRIAL</u> |
| | ) | |

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT

Plaintiffs Geneva Blanchard and Tiffany Miller, on behalf of themselves and all others similarly situated, with knowledge as to their own actions and events, and upon information and belief as to other matters, complain and allege as follows:

## NATURE OF THE ACTION

1.      This action challenges under §1 of the Sherman Act, an employee no-poach and no-hiring agreement orchestrated by Defendants Burger King Corporation and Burger King Worldwide, Inc. (together, "Defendants" or "Burger King") between and among Burger King restaurant franchisees, pursuant to which the franchisees agreed not to solicit, poach, or hire each other's employees.  Burger King orchestrated, designed, dispersed, and enforced the policy among all franchisees, at least in part, through explicit contractual agreements (and remedies for violation) in standard franchise documents.  The practice at issue reflects a naked restraint of competition and a *per se* violation of the antitrust laws.

2.      Founded in 1954, Burger King is the second-largest fast food chain in the world, with over 15,000 restaurants globally.  It has stores in all 50 U.S. states (plus the District of Columbia) and in multiple international markets.

3.      According to Burger King's 2017 Franchise Disclosure Document ("FDD"), more than 99% of its more than 15,000 restaurants worldwide are franchise restaurants.  Likewise, as of December 31, 2016, 7,105 of the 7,156 Burger King restaurants in the United States (more than 99%) were franchise restaurants.  Franchise restaurants are independently owned and operated by franchisees who have executed a standard form franchise agreement with Burger King.  Franchisees are separate and distinct legal entities from Burger King.  The standard initial franchise fee in the United States is $50,000.  Franchisees are responsible for other fees as well, and agree to pay to

Burger King royalties of up to 4.5% of gross sales and an "Advertising Contribution" of 4% of gross sales.

4.      Plaintiffs and the Class are current and former employees of Burger King franchise restaurants.   Plaintiffs and the Class suffered reduced wages and benefits and diminished employment opportunities as a result of the unlawful contract, combination, or conspiracy alleged herein.

5.      As part of the system that has made Burger King the fastest growing fast food restaurant chain in the United States, Burger King franchisees, at the direction of and with the assistance of Burger King itself, have together colluded to suppress the wages and employment opportunities of the restaurant-based employees who work at Burger King franchise locations throughout the United States.

6.      In particular, Burger King franchisees have contracted, combined, and/or conspired to not solicit, poach, or hire each other's employees.  This agreement was evidenced by franchisees' written pledge in their standardized franchise agreements.  Under the heading "Interference with Employment Relations of Others," they agreed:

> Neither BKC nor Franchisee will attempt, directly or indirectly, to entice or induce, or attempt to entice or induce any employee of the other or of another Franchisee of BKC to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.[1]

Every franchisee signing a franchise agreement beginning on a date at least as far back as 2010 and before September 2018 made this same agreement.

7.      Repeated breaches of the Burger King franchise agreement may entitle Burger King to terminate the agreement.  Franchisees violating the no-solicit and no-hire agreement thus agree

---

[1]      Burger King Corporation 2017 Franchise Agreement (hereafter "FA"), ¶5.K.

that Burger King may terminate the franchise of a franchisee for repeated violations, thus triggering forfeit of the franchisee's initial franchise fee, potential legal costs and expenses, and imposition of other onerous post-termination restrictions.

8.      The Burger King no-solicit and no-hire agreement is an unreasonable restraint of trade.

9.      As the Department of Justice ("DOJ") Antitrust Division and Federal Trade Commission's ("FTC") joint *Antitrust Guidance for Human Resource Professionals* (October 2016) states: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws."[2]   The DOJ/FTC *Guidance* elaborates:

> From an antitrust perspective, firms that compete to hire or retain employees are competitors in the employment marketplace, regardless of whether the firms make the same products or compete to provide the same services.   It is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs.[3]

10.     The no-poach and no-hire agreement between and among Burger King franchisees has eliminated franchisees' incentives and ability to compete for employees and has restricted employees' mobility.   This agreement has harmed employees by lowering the salaries and benefits employees otherwise would have commanded in a competitive marketplace, and has deprived employees of better job growth opportunities.

11.     The no-poach and no-hire agreement had and has the purpose of restricting competition for labor and had and has the intended and actual effect of fixing and suppressing compensation and restricting employment mobility.   The no-poaching agreement between and

---

[2]      Available at https://www.justice.gov/atr/file/903511/download (last visited Oct. 23, 2018).

[3]      *Id.*

- 3 -

among Burger King franchisees is a naked restraint of trade that is *per se* unlawful under §1 of the Sherman Act, 15 U.S.C. §1.  As the orchestrator of the unlawful agreement, Burger King bears *per se* liability therefor.

## THE PARTIES

**Plaintiffs**

12.     Plaintiff Geneva Blanchard is a citizen and resident of New Orleans, Louisiana.  She was employed since 2013 by GPS Hospitality Partners IV, LLC, a Burger King franchisee that owned and operated the Burger King store located at 120 Brownswitch Road, Slidell, Louisiana. Plaintiff was employed by GPS Hospitality Partners IV, LLC in job roles including crew member.

13.     Plaintiff Tiffany Miller is a resident of Allentown, Pennsylvania.  She was employed by an entity known as "Barto," a Burger King franchisee that owned and operated the Burger King store located at 15 South Centre Avenue, Leesport, Pennsylvania.  Miller was employed by Barto in job roles including crew member.

**Defendants and Related Entities**

14.     Defendant Burger King Corporation ("BKC"), is a Florida corporation with its principal place of business at 5505 Blue Lagoon Drive, Miami, Florida 33126.  BKC is the current franchisor of Burger King brand franchise restaurants in the United States.  BKC is a wholly owned indirect subsidiary of Burger King Worldwide, Inc.

15.     Defendant Burger King Worldwide, Inc. ("BKW") is a Delaware corporation with its principal place of business at 5505 Blue Lagoon Drive, Miami, Florida 33126.

16.     In 2010, private investment firm 3G Capital acquired BKC and BKW.  In 2014, 3G Capital merged Burger King into Restaurant Brands International, Inc. ("RBI").  BKW is now an

indirect subsidiary of Restaurant Brands International Limited Partnership ("RBILP"), which is a Canadian limited partnership located in Ontario, Canada.

17.     RBI is a Canadian corporation located in Ontario, Canada.  RBI is the general partner of RBILP.  RBI is one of the world's largest quick-service restaurant companies, with approximately $23 billion in system sales and over 18,000 restaurants in 100 countries.  In addition to Burger King, RBI also owns Tim Hortons® brand restaurants and Popeyes® brand restaurants.  Neither RBI nor RBILP are named as Defendants herein.

18.     Burger King is in the business of selling food to customers primarily through independently owned and operated franchise restaurants.  It has multiple franchise restaurants in every U.S. state and the District of Columbia.

**Co-Conspirators**

19.     Various other corporations and persons not named as defendants in this Complaint, including Burger King franchisees, participated as co-conspirators in the violations alleged and performed acts and made statements in furtherance of the violations alleged.

## JURISDICTION AND VENUE

20.     This action is instituted under §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs by virtue of Defendants' violations of §1 of the Sherman Act, 15 U.S.C. §1 and to enjoin further violations.  The Court has subject matter jurisdiction under §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, under §4 of the Sherman Act, 15 U.S.C. §4, and under 28 U.S.C. §§1331, 1332(d), 1337 to prevent and restrain the Defendants from violating §1 of the Sherman Act, 15 U.S.C. §1.

21.     Venue is proper in this judicial district under §§4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22, and 26, and under 28 U.S.C. §1391(b)(2), (c)(2).  Burger King transacts or has transacted business in this district.  A substantial part of the events that gave rise to this action occurred in this district.

22.     Burger King brand franchise restaurants are in each state in the United States.  Burger King has substantial business activities with each franchised restaurant, including entering into a contractual franchise agreement with the owner of the franchise.  Burger King engages in substantial activities at issue in this Complaint that are in the flow of and substantially affect interstate commerce.

## FACTUAL ALLEGATIONS

23.     Burger King franchisees compete with each other.  In a properly functioning and lawfully competitive labor market, Burger King franchisees would openly compete for labor, including employees, by soliciting current employees of one or more other franchisees (*i.e.*, attempting to "poach" other franchisees' employees).  A properly functioning labor market would involve "cold calling": the practice by which a prospective employer freely communicates with prospective employees – even if the employee does not first express interest.

24.     For instance, if Franchise A believes that a certain employee performs his job well at Franchise B, then Franchise A would be free to contact that employee about an employment opportunity.  Conversely, if an employee of Franchise B perceives Franchise A to be a better organization – whether because of increased wages, better benefits, or otherwise – then the employee would be free to communicate with Franchise A about potential employment.

25.     Poaching and cold-calling are thus important aspects of a lawfully competitive labor market.  Companies perceive other, rival companies' current employees, especially those who are

- 6 -

not actively seeking other employment, in a more favorable way. This is true at least in part because companies value satisfied employees who are good at their jobs, leading them to perceive a rival company's current employees as more qualified, harder working, and more stable than those candidates who are unemployed or who are actively seeking employment. Thus, a company seeking to hire a new employee will lessen the risks associated with that hire by seeking to hire a rival's employee. The Burger King no-poach agreement inhibits such lateral hiring of current employees because, unless Franchise B grants permission, Franchise A cannot hire Franchise B's current (or recent) employee. Franchise A can only do so once the employee has been separated from Franchise B for more than six months, at which time the employee likely will be viewed by Franchise A as less valuable. Cold-calling and poaching are thus useful and key competitive tools for companies seeking to recruit employees, particularly employees with unique skills.

26.     No-poaching agreements significantly impact employee compensation. For example, an employee of Franchise B will lack information regarding Franchise A's pay packages unless cold calling and open communications are permitted; without such information, the employee lacks leverage when negotiating with Franchise B. Similarly, unconstrained by a no-poaching agreement, if an employee of Franchise B receives an offer of higher compensation from Franchise A, the employee can either accept Franchise A's offer or attempt to negotiate a pay increase with Franchise B. Either way, the employee's compensation increases.

27.     An employee of Franchise B who receives information regarding potential compensation from a rival employer will also likely inform other Franchise B employees. These Franchise B employees can then also use that information to negotiate pay increases or move to another employer – even if they do not receive a cold call.

28.     Increased mobility combined with increased information and transparency regarding compensation levels tends to increase compensation across all current employees in the labor market.   After all, there is pressure amongst rival employers to match or exceed the highest compensation package offered by rivals in order to gain and retain skilled labor.   Further, the possibility of losing talent to a rival means companies will take steps to reduce the risks of poaching by assuring that employees are not undercompensated.

29.     In a properly functioning and lawfully competitive labor market, Burger King franchisees would also openly compete for labor by hiring those qualified employees of competing franchises who seek out employment with other franchises.

30.     The beneficial effects of competition (and beneficial effects on compensation) are not, however, limited to those particular individuals who receive cold calls or who wish to speak to a rival company about an employment opportunity.   The effects instead impact all similarly situated employees because of the effect on information flow and on competition for labor.

31.     For all these reasons, the principle of free competition applies to the labor market as well as to trade.   "In terms of suppressing competition, companies agreeing not to compete for each other's employees is the same as companies agreeing not to compete for each other's customers," says Joseph Harrington, Wharton professor of business economics and public policy, in his description of a no-poaching agreement.

32.     According to Peter Cappelli, Wharton management professor and director of Wharton's Center for Human Resources, a no-poaching agreement is unfair to employees and such a pact "benefits the companies at the expense of their employees."   Mr. Cappelli notes that the reason such agreements are illegal and violate both antitrust and employment laws is because "[c]ompanies could achieve the same results by making it attractive enough for employees not to leave."

33.     The collusion of employers to refrain from hiring each other's employees restricts employee mobility.  This raises employers' power in the market at the expense of employees and diminishes employee bargaining power.  This is especially harmful to employees of Burger King franchise restaurants as those employees are frequently paid below a living wage, and the marketable skills they acquire through their work at Burger King restaurants primarily have value only to other Burger King restaurants and do not transfer to other fast food restaurants or businesses.[4]  In addition, widespread use of no-poach agreements within the franchise industry at large effectively reduces the number of competitive employers in a market to no more than the number of franchise companies.  No-poach agreements have anti-competitive impact in labor markets analogous to that of mergers in product markets.

34.     Although unemployment in the United States is currently very low, wage growth has been slow.  A decade removed from the Great Recession, wage growth has remained stuck below 3%.[5]  A growing number of commentators have identified proliferating employer no-poaching agreements – including those used within franchise systems – and dubious employee non-compete agreements as significant contributors to this stagnant wage growth.[6]

---

[4]     In 2014, the average hourly wage of fast food employees was $9.09, or less than $19,000 per year for a full time worker.  The poverty level of a family of four in the U.S. is $23,850.  Patrick M. Sheridan, *Low Wage, health activists prepare McDonald's attack*, CNN Business (May 20, 2014) http://money.cnn.com/2014/05/20/news/companies/mcdonalds-meeting (last visited Oct. 23, 2018).

[5]     *See* Jana Kasperkevic & Kimberly Adams, *Here is the truth about wages that you won't hear from Trump*, Marketplace (Feb. 2, 2018), https://www.marketplace.org/2018/02/02/economy/here-truth-about-wages-you-won-t-hear-trump (last visited Oct. 23, 2018).

[6]     *See, e.g.*, Rachel Abrams, *Why Aren't Paychecks Growing? A Burger-Joint Clause Offers a Clue*, NEW YORK TIMES (Sept. 27, 2017), https://www.nytimes.com/2017/09/27/business/pay-growth-fast-food-hiring.html (last visited Oct. 23, 2018); Alan B. Krueger and Eric Posner, *Opinion: Corporate America Is Suppressing Wages For Many Workers*, NEW YORK TIMES (Feb. 28, 2018), https://www.nytimes.com/2018/02/28/opinion/corporate-america-suppressing-wages.html   (last visited Oct. 23, 2018).

35.     The United States DOJ has pursued and resolved civil antitrust investigations relating to no-poach agreements made between or among employers.  In 2010, DOJ settlements with six high-tech employers prohibited those companies from engaging in anticompetitive no-solicitation agreements relating to their employees on a going-forward basis.

36.     As noted above, the 2016 DOJ/FTC *Antitrust Guidance for Human Resource Professionals* states: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are per se illegal under the antitrust laws."

37.     On November 21, 2017, United States Senators Cory Booker and Elizabeth Warren wrote to Attorney General Jeff Sessions, asking the AG to respond to questions about the DOJ's approach to addressing the anti-competitive effects of proliferating no-poach agreements in the franchise context in particular.

38.     In January 2018 and at several speaking events since that time, DOJ Antitrust Chief and Assistant Attorney General, Makan Delrahim, disclosed that the DOJ Antitrust Division is presently pursuing a number of ***criminal*** cases relating to employer no-hire agreements.  As noted above, the DOJ treats such agreements as *per se* unlawful under §1 of the Sherman Act.

39.     In April 2018, the DOJ announced that it had resolved an investigation into a no-poach agreement among firms in the rail industry, which – like the other matters discussed above – it labeled as *per se* unlawful.

40.     In July 2018, Attorneys General from 11 states announced an investigation into no-poaching hiring practices at a number of fast food franchise chains, including Burger King. According to a release from Illinois Attorney General Lisa Madigan, the state is investigating no-poach agreements because those agreements "unfairly stop[] low-income workers from advancing

and depress[] their wages." The state AGs demanded documents and information from franchisors about their no-poach practices.

41.    In July 2018, Washington Attorney General Bob Ferguson announced that in order to avoid lawsuits, seven franchisors had reached agreements to discontinue enforcement of no-poach provisions and to take steps to remove no-poach language from franchise agreements going forward. Burger King was not among these franchisors.

42.    In August 2018, Attorney General Ferguson announced that in order to avoid lawsuits, eight more franchisors had entered into Assurances of Discontinuance relating to no-poach and no-hire agreements. Burger King was also not among these eight companies.

43.    In September 2018, Burger King also finally entered into an Assurance of Discontinuance relating to the no-poach and no-hire agreement evidenced in its then-current franchise agreement. AG Ferguson announced on September 13, 2018, that among eight additional restaurant chain franchisors, Burger King had agreed to discontinue enforcement of no-poach provisions and to take steps to remove no-poach language from some franchise agreements going forward. In particular, Burger King agreed that it would, *inter alia*, (i) no longer include the no-solicit and no-hire provision in any of its new (or renewing) franchise agreements in the United States; (ii) not enforce the no-solicit and no-hire provision in any existing franchise agreements in the United States; (iii) notify all current U.S. franchisees of its agreement with the Washington AG; and (iv) take steps to encourage franchisees that have stores in the state of Washington to remove the provisions immediately. The Assurance of Discontinuance specifically notes that Burger King "is under no obligation to offer its franchisees any consideration – monetary or otherwise – in order to induce them to sign the proposed amendment [removing the provisions], or take any adverse action against such franchisees if they refuse to do so."

- 11 -

44.     Defendants made no assurance that they would attempt to remove the provisions from existing franchise agreements with non-Washington franchisees.  Nor did any action taken by AG Ferguson or by Burger King resolve any civil liability to franchisee employees in Washington or anywhere else.

**The Burger King System**

45.     Founded in 1954, Burger King is the second-largest fast food hamburger chain in the world, with over 15,000 restaurants worldwide.  Every day, more than 11 million guests visit Burger King restaurants.  Burger King sells a variety of quick service food, including hamburgers, chicken, and other specialty sandwiches, French fries, soft drinks, and other food items.

46.     Burger King restaurants are either operated by a franchisee or by Burger King. Burger King revenues come from three sources: (i) franchise revenues, consisting primarily of royalties based on a percentage of sales reported by franchise restaurants and franchise fees paid by franchisees; (ii) property revenues from properties it leases or subleases to franchisees; and (iii) sales at Company restaurants.[7]

47.     Nearly 100% of the approximately 7,100 U.S. Burger King restaurants are franchises, with only about 50 corporate-owned U.S. restaurants.

48.     Burger King franchise restaurants can be located in strip shopping centers, shopping malls, free-standing units, and other locations.  Each franchisee is responsible for locating an appropriate restaurant site, which must be approved by Burger King.  The franchise is required to operate the restaurant at the specific site that Burger King approves, and may not relocate without Burger King's approval.

---

[7]     Restaurant Brands International Inc. 2016 Form 10-K Annual Report, at 4.

49.     Most of the company's franchises are subject to a standard 20-year franchise license agreement.  The initial Burger King franchise fee is currently $50,000.  In 2017, Burger King disclosed its estimate that the total investment necessary to begin operation of a Burger King franchise restaurant ranges from approximately $317,100 to $3,046,600.

50.     Each franchise is operated as an independently owned and managed business by an entity that is a separate legal entity from Burger King.  Burger King licenses to franchisees the right to use the Burger King brand and Burger King system in the operation of these independently owned franchise restaurants.

51.     Like other fast food chains in the industry, Burger King restaurants maintain teams of staff in order to oversee operations and guide entry-level employees through daily responsibilities.

**Burger King Franchisees: Independent Restaurant
Owners Competing with One Another**

52.     Each franchise is operated by an entity that is a separate legal entity from Burger King.  Each franchise is an independently owned and independently managed business.

53.     In executing the Burger King franchise agreement, a franchisee specifically agrees that it is "an independent contractor and is not an agent, partner, joint venturer, joint employer, or employee of BKC, and no fiduciary relationship between the parties exists."[8]

54.     A Burger King franchisee agrees contractually to identify itself as an independent owner of the franchised restaurant in all public records, stationery, business forms, and checks.  It agrees to exhibit in the restaurant "a notification that the Franchised Restaurant is operated by an independent operator and not by BKC."[9]

---

[8]     FA, ¶11.B.

[9]     *Id.*

55.     The hiring section of Burger King's website directs prospective employees to the particular openings available at specific franchise and store locations in the geographic area selected by the prospective employee.  Burger King's website asserts that "[j]ob descriptions, compensation, benefits and other employment terms and conditions applicable to positions at independent franchised BURGER KING® Restaurants will vary and are determined solely by the Franchisee."[10]

56.     Franchisees are responsible for day-to-day operations, including employment matters. Each franchisee specifically agrees that it is "solely responsible for all aspects of the employment relationship with its employees, with the sole right to hire, discipline, promote, demote, transfer, discharge, and establish wages, hours, benefits, employment policies, and other terms and conditions of employment for its employees without consultation with or approval by BKC."[11]

57.     Burger King franchise restaurants compete with each other.  In the FDD, Burger King tells prospective franchisees that "the quick service restaurant industry in which you will operate is intensely competitive.  You compete with other restaurants in the quick service industry and other food service companies."[12]  The Burger King franchise is for a single restaurant at a specified location and "does not grant [the franchisee] or imply any type of area or territory, exclusive, protected or otherwise, or protected customer base."[13]  The FDD informs franchisees that they "do not have any right to prevent or restrict the development of other restaurants at any other location, at any time."[14]  Burger King notifies franchisees that "[o]ther BURGER KING Restaurants may compete with your Restaurant or may affect customer trading patterns.  Because you will not receive

---

[10]    *See* https://www.bk.com/careers/in-restaurant/1354 (last visited Oct. 23, 2018).

[11]    FA, ¶11.B.

[12]    BKC 2017 Franchise Disclosure Document (hereafter "FDD"), at Item 1.

[13]    FDD Item 12.

[14]    *Id.*

an exclusive territory, you may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control."[15]

58.     In executing the Burger King franchise agreement, franchisees agree to these terms, and agree that the franchise "is for the specified location only and does not in any way grant or imply any area, market, or territorial rights proprietary to Franchisee."[16]

**The Agreement Not to Compete for Employees**

59.     Notwithstanding that each franchise is an independently owned and operated business that competes with other franchises, and notwithstanding that each (ostensibly) is "solely responsible for all aspects of the employment relationship with its employees, with the sole right to hire, . . . transfer, . . . and establish . . . employment policies, and other terms and conditions of employment for its employees  . . .[,]"  Burger King franchisees have agreed not to compete with each other with respect to employee hiring.  This agreement is evidenced by and memorialized in explicit contractual terms contained in franchisees' Burger King franchise agreements.

60.     In particular, beginning no later than 2010, Burger King and each franchisee contractually agreed that they would not:

> attempt, directly or indirectly, to entice or induce or attempt to entice or induce any employee of [BKC] or of another Franchisee of BKC to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.[17]

---

[15]     *Id.*

[16]     FA, ¶1.

[17]     FA, ¶5.K.

61.     Franchisees also agree, by contract, that in the event a legal action is necessary to enforce the terms of the Burger King franchise agreement, the prevailing party is entitled to payment by the other party of all costs and attorneys' fees incurred.

62.     Repeated breaches of the franchise agreement can amount to "default" of the agreement.  In executing the franchise agreement, franchisees agree that if Burger King provides notice of intent to terminate due to repeated breach, it thereafter has the right to terminate the agreement upon notice and without further opportunity to cure.  Violations of the no-poach agreement thus risk the franchisee's entire investment in the business.

63.     Violations of the no-poach agreement thus subject a franchisee to termination of the franchise and forfeiture of the franchise fee.  Franchise termination carries additional risks, as well. In executing franchise agreements, Burger King franchisees contractually covenant that they will not operate or have any interests in any hamburger business for a period of one year after termination of the agreement within a two-mile radius.[18]

64.     Where a franchisee is a non-individual business entity, managing owners of the franchisee must also execute notarized personal guarantees pursuant to which they agree to be personally bound by the non-competition covenants contained in the franchise agreement.

65.     Burger King franchises, like other franchises, are made available on standardized terms.  So a franchisee who enters into a Burger King franchise agreement knows that the same terms it has agreed to also apply to other franchisees.

66.     One of the standard terms in Burger King's franchise agreements with all its franchisees is the no-poach provision referred to above.

---

[18]     FA, ¶19.

67.     Even though Burger King purportedly removed the no-poach language from new franchise agreements on a going-forward basis beginning in September 2018, there were and are thousands of Burger King franchise restaurants already in existence and operating under older versions of the franchise agreement that contained those provisions.

68.     The Burger King franchise agreement contains a merger and integration clause. Franchisees specifically contract for a franchise agreement that can be modified or amended only by a subsequent written document executed by both Burger King and the franchisee.

69.     The Burger King FDD includes a list of all Burger King franchisees, organized by state, city, and street address.  Franchisees thus know that these entities are the other franchisees as to whom the no-poach agreement memorialized in the franchise agreement applies.

70.     The no-poach and no-hire agreement among Burger King franchisees is short-sighted and ultimately not in the franchisees' independent interest, even though it is in the interest of the conspirators as a whole when acting together.

71.     The no-poach and no-hire agreement does not serve the interests of ensuring that Burger King restaurants produce a quality product.

72.     The no-poach and no-hire agreement does not serve fast-food customers because it does not incentivize Burger King franchisees to invest in training workers to improve the Burger King food, experience, and service.

73.     Consumers can gain from competition among employers because a more competitive workforce may create more or better goods and services.  Further, unemployment is at record lows, yet wage growth has remained sluggish.  Fast-food workers regularly rely on public assistance to supplement their income.  Higher wages would lessen the strain on public assistance, benefiting all consumers.

74.     The no-poach and no-hire agreement is not in the independent interest of Burger King franchisees, if acting unilaterally.  Employees are critical to the success of Burger King franchises. A significant component of making the franchise profitable is hiring qualified, motivated, and superior employees.  Therefore, it is in the independent interest of each Burger King franchisee to compete for the most talented and experienced restaurant employees.

75.     By adhering to the no-poach and no-hire agreement, franchisees artificially restrict their own ability to hire employees in a manner that is inconsistent with their own unilateral economic interests.  By acting in concert, however, they also protect themselves from having their own employees poached by other franchises that see additional value in those employees, such as their training, experience, and/or work ethic.  This allows franchisees to retain their best employees without having to pay market wages to these employees or compete in the marketplace relative to working conditions and promotion opportunities.

76.     Most importantly, the no-poach and no-hire agreement does not serve franchisee employees because it does not incentivize franchisees to invest in higher wages, benefits, and improved working conditions, *i.e.*, to compete for their labor.  It also dis-incentivizes employees to perform their best work as those efforts are not rewarded commensurately.  Competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment.

77.     Burger King franchisees have a shared interest, however, in keeping labor costs low. As noted above, franchisees pay to Burger King royalties based on a percentage of gross sales.  Cost of labor therefore has a direct impact on franchisee profitability.  By agreeing to not compete for labor, they act against their unilateral self-interest, but serve their shared interest.

78.     But for the no-poach agreement, each Burger King franchise is its own economic

decision-maker with respect to hiring, firing, staffing, promotions, and employee wages.  But for the

no-poach agreement, each Burger King franchise would compete with each other for the best-

performing employees.

**Other Evidence of Burger King's System-Wide**
**Commitment to Suppressing Employee Wages**
**and Mobility and of the Unlawful Agreement**

79.     Low wages are consistent, even if not uniform, across the Burger King system.  This

has allowed Burger King's owners and executives, and Burger King franchisees, to become wealthy

while full-time, hardworking employees often must resort to government benefits just to put food on

their own tables.  A significant reason for this is that Burger King has orchestrated an agreement

among franchisees to stifle employee wages and mobility.

80.     The average fast-food worker in the United States makes approximately $19,900 per

year, while the average fast-food CEO earns $1.2 million per year.

81.     If franchisees had to either pay and promote good employees, or lose them to

competitor locations, they would be forced to pay competitive wages and provide competitive

promotion opportunities.  However, because of the no-hire agreement, and because the education,

training, and experience within the Burger King system are unique to Burger King and not

transferrable to other restaurants, Burger King franchisees do not have to compete with other Burger

King franchisees, and do not have to compete with non-Burger King businesses for their employees.

82.     Hart Research Associates surveyed 1,088 fast food workers in 10 major metro areas,

and found that 89% of fast food workers have experienced wage-theft, in multiple forms, at their fast

food job.  Wage theft occurs through forcing employees to work off the clock, not paying workers for all hours worked, denying breaks, and failing to pay for overtime.[19]

83.     From 2007 to 2011, fast food workers in the U.S. drew an average of $7 billion of public assistance annually because of low wages.

84.     Burger King and its franchisees are well-versed in restrictive covenants as they regularly employ onerous "unfair competition" agreements binding the franchise owners.  Pursuant to the franchise agreement, during the franchise term, Burger King franchisees are contractually prohibited from engaging indirectly or directly in any other hamburger business.  After termination or expiration of the agreement, franchise owners may not have any interest in a fast-food business within two miles of the franchise restaurant location.  In executing the franchise agreement, "Franchisee acknowledges the uniqueness of the BURGER KING System and that BKC is making its knowledge, know-how and expertise available to him for the purpose of operating the Franchised Restaurant.  Franchisee agrees that it would be an unfair method of competition for Franchisee to use or duplicate or to allow others . . . to use or duplicate any of the knowledge, know-how and expertise received from BKC."[20]

85.     In addition to their shared motivation to enforce the no-hire agreement, and their actual understanding of the no-hire agreement, Burger King franchisees also have abundant opportunity to communicate about and coordinate their no-hire agreement.

86.     More than 75% of Burger King franchised restaurants in the U.S. and Canada are represented by the National Franchisee Association ("NFA"), which holds annual conferences for franchisee networking and education.  Other regional franchisee associations, such as the Great

---

[19]     *See* Hart Research Associates, *Key Findings for Survey of Fast Food Workers* (Apr. 1, 2014), http://big.assets.huffingtonpost.com/NationalWageTheftPollMemo.pdf (last visited Oct. 23, 2018).

[20]     FA, ¶12.

Western Franchisee Association ("GWFA") and the New South Coalition ("NSC"), also provide forums and advocacy for hundreds of Burger King franchise restaurants. The GWFA hosts at least two franchisee meetings each year and both groups foster franchisee communication to advance the cause of working together to enhance the value of franchise investment.

**Employment with Non-Burger King Brands Is Not a**
**Reasonable Substitute for Burger King Employees**

87. Training, education, and experience within the Burger King system are not transferrable to other restaurants for a number of reasons.

88. Burger King franchises are required to utilize Burger King's own operations systems, including its Manual of Operating Data or "MOD Manual" which is considered confidential and proprietary information that each franchisee must agree not to disclose. The MOD Manual is comprised of the Burger King operations manual, the restaurant equipment manual, approved brands and distributors list, approved equipment list, and the brand standards guide, among other documents. The purpose of the MOD Manual is to protect Burger King's standards, the Burger King system, and the Burger King trademarks. Experience and training with these systems is of little value to other restaurants.

89. Burger King reserves for itself the right to specify or require certain brands or models of communications equipment, computer systems, hardware for back-office and point-of-sale systems, printers and peripherals, backup systems, and the like. Experience with these systems is of little value to other brand restaurants.

90. Franchisees use approved or mandatory suppliers and vendors affiliated with Burger King. Experience with these vendors is of little value to other restaurants.

91. Moreover, franchisees must use the computers, point-of-sale equipment, and systems specified by Burger King and must also collect, process, and store customer data specified by Burger

King.  Franchisees are required to generate reports and records required by Burger King and allow access to all such records and reports.  In addition, Burger King requires that all franchisees transmit point-of-sale data to Burger King through data reporting systems approved by Burger King. Training or skill in the operation of these systems is of little use to non-Burger King restaurants.

92.    A no-poach and no-hire agreement like the agreement among Burger King franchisees reduces employees' outside options and lowers their quit rate, thereby increasing the share of net-returns captured by employers.  Further, a franchise-wide no-hire agreement increases the specificity of human capital investment, as training that is productive throughout the franchise chain can be used only by a single franchisee pursuant to the agreement.

## REPRESENTATIVE PLAINTIFF ALLEGATIONS
## AND ANTITRUST INJURY

**Plaintiff Geneva Blanchard**

93.    Plaintiff was employed as a "crew member" since 2013 at a Burger King store located at 120 Brownswitch Road, Slidell, Louisiana, a Burger King franchise store owned and operated by GPS Hospitality Partners IV, LLC.  Plaintiff earned $7.35 per hour when she started at the store, requiring her to take a second job at a hotel just to survive.

94.    In 2016, Plaintiff's pay was reduced to $7.25 per hour, and she began to lose shifts from five days per week, to four, to three, to two, and eventually, Plaintiff stopped receiving any shifts at all.  Plaintiff has never quit working for Burger King even though she has not received any hours since late 2016.

95.    The no-poach and no-hire agreement among Burger King franchisees suppressed Plaintiff's wages, inhibited her employment mobility, and lessened her professional work opportunities.

**Plaintiff Tiffany Miller**

96.     Plaintiff Tiffany Miller is a resident of Allentown, Pennsylvania.     From approximately February 2011 until early 2013, Miller was employed at a Burger King franchise restaurant located at 15 S. Centre Avenue, Leesport, Pennsylvania.  At all relevant times, Miller was an at-will employee, paid on an hourly basis.

97.     Miller worked as a casher for minimum wage with no raises or promotions.

98.     In 2012, Miller asked to be moved to a Burger King in Allentown, nearer her home, but she was denied.  In 2013, Miller asked whether she could apply for a cook position that was opening up at a Burger King nearer her home, but this was again denied.  Eventually, she had to quit her job at Burger King in Leesport because of the travel hardship.

99.     The no-poach and no-hire agreement among Burger King franchisees suppressed Plaintiff's wages, inhibited her employment mobility, and lessened her professional work opportunities.

**Antitrust Injury**

100.     Plaintiffs suffered reduced wages, reduced employment benefits, loss of professional growth opportunities, and worsened working conditions because of the express restraint of trade among Burger King franchisees, as orchestrated by Burger King itself.

101.     Suppressed wages and employment benefits resulting from their employers' agreement not to compete with each other in the labor market is injury of the type the antitrust laws were intended to prevent and flows from that which makes the no-poach and no-hire agreement unlawful.

102.     Indeed, the no-poach and no-hire agreement embodies norms that are widely accepted across the fast-food industry and are familiar to franchisees.  In advising new restaurant owners on

- 23 -

how to hire their first general manager, one industry expert instructs that "you have to be careful that you do not earn a reputation for stealing other people's employees."

103.    The potential for broader collusion in franchise chains is enhanced when no-poach agreements are in place.  Collusion is promoted when the no-poach agreements can be easily generated and monitored amongst a concentrated group of competitors who all stand to gain profits from the collusion while maintaining similar costs.

104.    The Burger King franchisees' no-hire agreement significantly restricts employment opportunities for low-wage workers at all Burger King restaurants, including those who have not sought employment with a competitor franchise and those who have not been contacted by a competitor franchise.  Such a restriction causes a wider effect upon all Burger King restaurant employees.

105.    Plaintiffs were victims of the no-poach and no-hire agreements.  By adhering to that agreement, otherwise independently owned and operated competitor businesses suppressed wages and stifled labor market competition for improved employment opportunities.

**CLASS ACTION ALLEGATIONS**

106.    Plaintiffs bring this action on behalf of themselves and on behalf of a nationwide Class pursuant to the Federal Rules of Civil Procedure, Rule 23(a), (b)(2), and/or (b)(3).

107.    The Class is defined as: All persons in the United States who are current or former employees at all franchisee-operated Burger King restaurants.

108.    Excluded from the Class are Defendants, their affiliates, officers and directors, and the Court.  Plaintiffs reserve the right to modify, change, or expand the Class definition on discovery and further investigation.

109.     Numerosity:  Upon information and belief, the Class is so numerous that joinder of all members is impractical; there are thousands of Burger King restaurants in the U.S.  While the exact number and identities of the individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that thousands of Class members are the subjects of the Class.

110.     Existence and Predominance of Common Questions of Fact and Law: Common questions of fact and law exist as to all members of the Class.  These questions predominate over the questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, whether:

(a)     Defendants orchestrated and engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce;

(b)     Defendants violated the Sherman Antitrust Act, 15 U.S.C. §1, *et seq.*;

(c)     Defendants should be required to disclose the existence of such agreements, contracts, combinations, and/or conspiracies;

(d)     Plaintiffs and Class members are entitled to damages, restitution, disgorgement, equitable relief, and/or other relief; and

(e)     The amount and nature of such relief to be awarded to Plaintiffs and the Class.

111.     Typicality: All of Plaintiffs' claims are typical of the claims of the Class inasmuch as Plaintiffs were Burger King franchisee restaurant employees and each member of the Class either was or is a Burger King franchisee restaurant employee subject to the same agreements and rules as Plaintiffs.  Further, Plaintiffs and all the members of the Class sustained the same monetary and economic injuries of being subjected to artificial suppression of compensation, wages, benefits, and

growth opportunity, and the remedy sought for each is the same in which Plaintiffs seek relief against Defendants for themselves and all Class members.

112.   Adequacy: Plaintiffs are adequate representatives because Plaintiffs' interests do not conflict with the interests of the Class that Plaintiffs seek to represent, Plaintiffs have retained counsel competent and highly experienced in complex class action litigation, and Plaintiffs and Plaintiffs' counsel intend to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs and Plaintiffs' counsel.

113.   Superiority:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class.  The injuries suffered by each individual Class member are relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not.   Individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.  Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' employment records and franchisees' records.

114.   Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## FRAUDULENT CONCEALMENT

115.    Plaintiffs and Class members had neither actual nor constructive knowledge of the unlawful no-poach and no-hiring conspiracy orchestrated by Defendants, nor would any reasonable amount of diligence by Plaintiffs or the Class have put them on notice of the conspiracy.  Any statute of limitations is therefore tolled by Defendants' intentional concealment of their no-poach and no-hire agreement.  Plaintiffs and Class members were deceived regarding Defendants' collusion to suppress wages and employment mobility and could not reasonably discover the Defendants' anticompetitive conduct.

116.    Neither Defendants nor franchisees disclosed the existence of the no-poach and no-hire conspiracy to Plaintiffs or Class members.

117.    Burger King's public statements conceal the fact that it orchestrated and engaged in a no-poach and no-hire conspiracy among franchisees.

118.    On its website, Burger King lauds its "Commitment to People."  It claims to be "dedicated to supporting and investing in our people – employees, franchisees, suppliers and restaurant guests – because they are the cornerstones of our business.  We do all that we can to serve employees and guests alike."[21]  The plaudits go on: "We continue to distinguish ourselves from our competitors by being an exceptional employer" that "vest[s] individuals with the power and control to achieve their goals whether that person is our colleague, our franchisee, our supplier or our restaurant guest."[22]

119.    Burger King also touts its "Commitment to Corporate Governance."  On its website, it asserts:

---

[21]    *See* https://www.bk.com/corp-respon (last visited Oct. 23, 2018).

[22]    *Id.*

Our codes and company policies encompass not only our core ethical principles, but also specific issues that our employees and business partners face on a day-to-day basis. Our goal is to continuously reinforce our policies and procedures to ensure compliance with the law as well as openness and accountability.

The core ethical and governance principles of BKC begin at the top. The board sets the tone by promoting an ethical culture that respects and values all employees and stakeholders and encourages compliance with all laws and company policies.[23]

120.    Burger King's website goes on to reference its "Code of Business Ethics and Conduct for Vendors" and to tout its recognition as a "good corporate citizen."[24] The Code of Business Ethics asserts that "[o]ur philosophy is simple: integrity, honesty and compliance with the law are not optional."[25] These statements conceal the fact that Burger King and its franchisees have, in fact, conspired to suppress the wages and employment mobility of the very employees they purport to value.

121.    Burger King similarly tells employees and prospective employees that "[w]e're a business that's 100% built on the energy and hunger of its people. Whether you join us in a restaurant or in a corporate role, you'll never be short of opportunities to show what you've got. And if we like what we see, there's no limit to how far you could go here."[26]

122.    Burger King refers to itself as a "meritocratic" business and tells prospective employees that "we expect a lot of our people. You'll need extraordinary levels of ownership, drive, and accountability to join the team here. Demonstrate all that, though, and you'll quickly discover that this is an environment where great results and great rewards go hand in hand. It's not a regular

---

[23]    *Id.*

[24]    *Id.*

[25]    *See* Restaurant Brands International Code of Business Ethics and Conduct for Vendors, http://www.rbi.com/Cache/1500094810.PDF?O=PDF&T=&Y=&D=&FID=1500094810&iid=4591 210 (last visited Oct. 23, 2018).

[26]    *See* https://www.bk.com/careers/bring-it-bkc (last visited Oct. 23, 2018).

job for sure.  But if you're looking for the chance to really make something of yourself, that's exactly what you'll find at BKC."[27]  These statements conceal the fact that Burger King and its franchisees have in fact colluded to suppress the wages of franchise store personnel.

123.    As noted above, the "Job Opportunities" section of Burger King's website directs prospective employees to the particular openings available at specific franchise and store locations in the geographic area selected by the prospective employee.  It informs visitors that "[j]ob descriptions, compensation, benefits and other employment terms and conditions applicable to positions at independent franchised BURGER KING® Restaurants will vary and are determined solely by the Franchisee."[28]  These statements highlight the supposed hiring independence of franchisee-employers and conceal the existence of the collusive no-poach agreement.

124.    Plaintiffs and the Class would thus have no reason to know of the no-poach and no-hire agreements evidenced by franchisees' contractual undertakings with Defendants.  Plaintiffs and the Class are not parties to franchisees' contractual franchise agreements with Defendants.  Nor are these contracts routinely provided to Plaintiffs.

125.    Although Defendants provided their form franchise documents to state regulators, franchise disclosure documents and form franchise agreements are made available by Defendants only upon request by legitimate prospective franchisees.  Obtaining Defendants' historic franchise disclosure documents and form franchise agreements is even more difficult.

126.    In order to obtain Defendants' current franchise disclosure documents and form franchise agreement from Burger King, a prospective franchisee must submit a Personal Profile Franchise Application and pay an application fee of $250 per individual applicant.  The application

---

[27]    *Id.*

[28]    *See* https://www.bk.com/careers/in-restaurant/1354 (last visited Oct. 23, 2018).

requires submission of a personal financial statement on a Burger King form, along with detailed financial information.  Only after Burger King reviews the application to ensure that the franchisee meets initial qualifications does Burger King provide the franchise disclosure document. Prospective franchisees are told that in order to qualify for consideration, they should have a minimum of $500,000 in liquid assets, a net worth of $1,500,000 or greater, and have the ability to obtain financing to cover the cost of opening a location.

127.    Defendants' franchise disclosure documents and form franchise agreements are not routinely provided to employees (or prospective employees) of franchisees, whether by Defendants, by franchisee employers, by regulators, or by anyone else.  Historic franchise disclosure documents and form franchise agreements would never be available to franchisee employees or prospective employees.

128.    Even upon entering into the Assurance of Discontinuance with the Attorney General of Washington relating to the no-poach and no-hire agreement evidenced in Burger King's franchise agreement, Burger King purported to deny that it was in violation of Washington state law or any other law, and further purported to deny that the no-poach and no-hire agreement constitutes a "restraint of trade in violation of the Consumer Protection Act, RCW 1986.030, or any other law, rule or regulation."

129.    Because of Defendants' successful deceptions and other concealment efforts described herein, Plaintiffs and Class members had no reason to know Defendants had conspired to suppress compensation or employee mobility.

130.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiffs and the Class members have as a result of the anticompetitive and unlawful conduct alleged herein.

## CLAIMS FOR RELIEF

### Violations of §1 of the Sherman Act
### 15 U.S.C. §1, *et seq.*

131.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding and succeeding paragraphs of this Complaint, and further allege against Defendants as follows:

132.    Defendants orchestrated, entered into, and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce in violation of §1 of the Sherman Act, 15 U.S.C. §1, *et seq.*

133.    Defendants engaged in predatory and anticompetitive behavior by orchestrating an agreement to restrict competition among Burger King franchisees, which unfairly suppressed employee wages and unreasonably restrained trade.

134.    Defendants' conduct included concerted efforts, actions, and undertakings among the Defendants and franchise owners with the intent, purpose, and effect of: (a) artificially suppressing the compensation of Plaintiffs and Class members; (b) eliminating competition among franchise owners for skilled labor; and (c) restraining employees' ability to secure better compensation, advancement, benefits, and working conditions.

135.    Defendants perpetrated the scheme with the specific intent of lowering costs to the benefit of Defendants and franchise owners.

136.    Defendants' conduct in furtherance of the no-poach and no-hire agreement was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

137.    Plaintiffs and Class members have received lower compensation from Burger King franchise businesses than they otherwise would have received in the absence of Defendants'

- 31 -

unlawful conduct and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

138.   Defendants' contracts, combinations, and/or conspiracies are *per se* violations of §1 of the Sherman Act.

139.   In the alternative, Defendants are liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on employees and labor.

140.   Defendants' contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

141.   As a direct and proximate result of Defendants' contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiffs and Class members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

142.   Plaintiffs and the Class members are entitled to treble damages, attorneys' fees, reasonable expenses, costs of suit, and, pursuant to 15 U.S.C. §26, injunctive relief, for the violations of the Sherman Act and the threatened continuing violations alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class respectfully request that the Court:

A.   Determine that the claims alleged herein may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.   Appoint Plaintiffs as representatives of the Class and their counsel as Class Counsel;

C.   Declare that Defendants' actions as set forth in this Complaint violate the law;

D.      Award Plaintiffs and the Class damages in an amount according to proof against Defendants for Defendants' violations of 15 U.S.C. §1, to be trebled in accordance with those laws;

E.      Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the Class members are entitled;

F.      Grant a permanent injunction enjoining Defendants from enforcing or adhering to any existing agreement that unreasonably restricts competition as described herein;

G.      Declare Defendants be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition for employees except as prescribed by this Court;

H.      Declare Defendants to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class members;

I.      Award pre-judgment and post-judgment interest on such monetary relief;

J.      Award reasonable attorneys' fees and costs; and

K.      Grant such further relief that this Court deems appropriate.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

DATED:  October 31, 2018                 ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                         PAUL J. GELLER
                                         Florida Bar No. 984795
                                         STUART A. DAVIDSON
                                         Florida Bar No. 0084824
                                         JASON H. ALPERSTEIN
                                         Florida Bar No. 64205


                                            *s/Paul J. Geller*
                                         _____
                                            PAUL J. GELLER

- 33 -

120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
sdavidson@rgrdlaw.com
jalperstein@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
DAVID W. MITCHELL
CARMEN A. MEDICI
XAN BERNAY
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
davem@rgrdlaw.com
cmedici@rgrdlaw.com
xanb@rgrdlaw.com

McCUNE WRIGHT AREVALO, LLP
DEREK Y. BRANDT
100 North Main Street, Suite 11
Edwardsville, IL  62025
Telephone:  618/307-6116
dyb@mccunewright.com

McCUNE WRIGHT AREVALO, LLP
RICHARD D. MCCUNE
MICHELE M. VERCOSKI
3281 East Guasti Road, Suite 100
Ontario, CA  91761
Telephone:  909/557-1250
rdm@mccunewright.com
mmv@mccunewright.com

SCOTT+SCOTT ATTORNEYS AT LAW LLP
WALTER W. NOSS
STEPHANIE A. HACKETT
SEAN C. RUSSELL
600 West Broadway, Suite 3300
San Diego, CA  92101
Telephone:  619/233-4565
wnoss@scott-scott.com
shackett@scott-scott.com
sean.russell@scott-scott.com

SCOTT+SCOTT ATTORNEYS AT LAW LLP
MICHELLE E. CONSTON
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY  10169
Telephone:  212/223-6444
mconston@scott-scott.com

LIEFF CABRASER HEIMANN &
   BERNSTEIN, LLP
DEAN M. HARVEY
ANNE B. SHAVER
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone:  415/956-1000
dharvey@lchb.com
ashaver@lchb.com

*Counsel for Plaintiffs and the Class*